Are you ready? The last case to be argued this morning is No. 08-1602, Pressure Products Medical Supplies v. Quan Emerteq Corporation. Mr. Henry. Good morning. May it please the Court. We are here primarily to talk about two primary issues and one that's sort of built into one of the two issues. One is that we had a very prejudicial and late-coming reconstruction of a claim element. It was a pivotal claim element, common to all of the claims that went to the jury, that happened at such a time that someone in line with this Court's statement as to the 800 ADEP case changed the dynamic of the case and in this case really turned it on its head. Mr. Henry, is it proper for the District Court judge to at least consider claim construction right up to the time that he instructs the jury, provided that the claim construction is properly included in those instructions to the jury? Your Honor, there certainly are cases where that is applicable, but in this case the fundamental unfairness arises from the timing and the circumstances. As Judge Clark observed at our trial... Counsel, you asked him to construe it. I mean, this isn't a case where he went off in left field and did something crazy. He actually asked you specifically, do you want me to construe scoreline? And you said yes. How do you now come in and say he was abusing his discretion by doing it? Your Honor, I would disagree with that. If you were to ask me today, do I need to be admitted to practice before this Court to stand here today, I would say yes. But if I were able to continue, I would say, but I am admitted. And as you see later in the record at 3773, a joint appendix, we explained that it had been previously construed. We had relied on that construction. You didn't change that until after you got the bad construction you didn't like. You said yes, you wanted him to construe it. And what you're pointing me to now in the record is after you got the construction, you said, uh-oh, we don't like this. Then you came back and said, well, Your Honor, it was already construed. Well, Your Honor, we, at the very outset of the case, in the opening, we put the page of the Markman ruling with the construction up on the screen. And we told the Court, I told the jury, well, let's see what the Court has to say about what a scoreline is. And then we explained to the jury what that definition was at the very outset of the case, before any of this ever happened. So to say that we conceded that it had not been construed or that it needed to be reconstrued is simply incorrect, respectfully, given the picture overall. Why didn't you ask for a continuance at that point in time? Your Honor, at that point in time, our trial had already been moved twice as to date and once as to geography, based on the judge's express indication that this was the time period we had for this trial and it would not move whatsoever. Well, I think the judge is probably waiting for you to ask for a continuance. There's some indication in the record, at least the transcript, saying that I regret, I'm sorry, you refer to what? And then you decided to go forward. That was in the record at A3776. Well, we indicated to the Court that we would reassess our situation over evening, see what we could do. I believe Mr. Grinswagon, my co-counsel, said this has done some serious damage to our case. And then we were, as we were instructed, to go forward the next morning. We started the very next morning with what was left of our case. Well, it did enlarge the definition, I agree. But we have so many cases which have permitted the trial judge, as the evidence comes forward and as the understanding of the issues and of the invention is enlarged, to improve upon or make more specific or broader, in this case, whatever the meaning, whatever the definitions might be. And I gather that you accept at least that precedent. You're not saying that there was no seriously procedural flaw except for the fact that the enlargement turned out to be contrary to the definition you need. Well, it is not. We certainly contest the substantive definition, to be sure, and we will certainly address that. Well, let's get to that. That's the issue. You want to say that he misconstrued it. That's not really about the fairness point at this point. Isn't the fact that the district court relied on prior art that only removed the sheet to broaden the definition without taking into consideration that the claimed invention removed the sheet and the valve. Isn't that an error? Your Honor, that as well as the fact that we are dealing 100% with 112.6 limitations here, where we must, of course, find the corresponding structure. And if you look at the specification, you will find that the magistrate judge who conducted Markman, who drafted the Markman order, got it right, both with respect to what the corresponding structure was in terms of its term, scoreline, and also what scoreline meant. Did you point out to the district judge that his construction was based on the wrong prior art? Prior art only applied to sheath removal, not sheath and valve removal. We pointed out, Your Honor, that the prior art that was listed in the applications were not linked with or associated with. Did you specifically make the point that I did right now? You've got the wrong stuff, Your Honor. I believe we did, Your Honor. I cannot point you to the specific page in the Joint Appendix or the record. I apologize. We can get back to that. But I believe we did in so many words. If one looks at what the magistrate judge did, the magistrate who conducted the Markman hearing, he gave us a definition of scoreline. He said, First of all, a score has been defined to mean any scratched line or groove that is formed by a scoring process. Therefore, a scoreline should be limited to a line. The court ruled, Therefore, linking it all together, defined this term, the means for, to mean a scoreline defined in said hemostatic valve and introducer. So, again, the magistrate judge, we contend, got it right, both as to what was the corresponding structure and what that term meant. The new construction, however, turns out to be a linear perforation, slit, slot, tab, line, severing, weakening, or tear that can be partial or complete. You're troubled by the notion that a complete tear could somehow be a scoreline? A complete tear would actually suggest you have two separate pieces already, right? Exactly, Your Honor. It seems kind of tough to say that's a scoreline. Well, precisely, and as you'll see later on, even the court strained at that definition at some point. Do you think maybe the district court was defining, while he says he's defining scoreline, maybe in his own mind he was defining scoreline and equivalence thereof in his own mind? Well, very possibly. And, in fact, at one point the court chastised me for focusing on 112.6, what is the corresponding structure, what are equivalence. This is a quote in 3773. But they said scorelines. And this, again, you're speaking to me. You're shifting back to 112.6. Your Honor, that is precisely the issue. We had to first define what the corresponding structure was. Then we could talk about what equivalence. Now, as this court has said, among others, in Braun Medical, the specification must clearly link that which is the corresponding structure with the 112.6 element. That is the quid pro quo. That's taking the deal of using 112.6, the convenience of 112.6. And that's what they did. But the 112.6 statute explicitly says equivalence thereof. Yes, Your Honor. Distinguishing it from all other applications of the doctrine of equivalence. Yes, Your Honor. So shouldn't the claim construction also be in tune with the statute? Well, certainly the statute agrees and equivalence. We give you that. But we would argue that the court's core construction of the corresponding structure goes even beyond what would be permissible as equivalence. And if you- Counsel, haven't we actually held explicitly that whether something is an equivalent for 112.6 purposes, and I'm thinking, for example, of Chuminada, others come to mind, that that is a question of fact for the jury and not the province of the court as part of claim construction. So while the district court judge would have been free to define scoreline, but the equivalence part should have been left for the jury. Well, it should have been, but it was rolled in. Well, even more than could have possibly been supported by the evidence or the specification was rolled into the definition of the corresponding structure. And if one looks as, you know, per Phillips and Chuminada and others, if one looks at the context of the invention, an introducer that must, before you have completed its use, must be fluid-type, must prevent substantial bleeding, prevent ingress and egress of air, to say that it is even an equivalent to that which is merely scored and fluid-type and allows the device to work, something that's completely severed, completely torn, completely breached, I mean, that definition given by the court, complete tears and severs and cuts, it wouldn't even qualify as an equivalent. Mr. Henry, you've made an argument that there's a German patentee that anticipates the claims. Yes, Your Honor. How do you get around the fact that the inventor said it doesn't and whether it anticipates or not is a fact question and the jury decided there was no anticipation? Your Honor, that finding is against the great weight of evidence. The substantial evidence weighs against that. First of all, to address your point, the inventor said, well, the inventor, Dr. Handel, a German doctor resident in Germany, whom we were not able to depose, though we tried, what was before the jury and before the court was a declaration filed at the Patent and Trademark Office where Dr. Handel, in essence, disparages his own invention, said it wasn't enabling, it didn't work, I didn't know how to make it, etc. But let's look at what people before the court actually said. But Dr. Cameron's going to the weight of the evidence and such that wasn't there sufficient for the jury to find that it was sufficient? We believe not, Your Honor, and I'll explain that. Dr. Podetta. Dr. Podetta is your expert, and I grant you he says exactly what we wanted him to say. But they had Dr. Gang, their expert, who said the exact opposite, and then they had the inventor of the exact reference that you're saying discloses this combination. That inventor said, my reference doesn't disclose that combination. How do we second-guess the jury? Well, let's look at what Dr. Gang actually said at Joint Appendix 3767. Question, and he's on the cross-examination. So it appears that if Handel does have a valve, then Handel would anticipate the 904 patent, correct? Yeah, well, in a sense. Handel does have a valve. It's just, to my reading, not a hemostatic valve that we discussed before, not a splittable valve. Then at 3768. Question, as noted by Handel, the 600 does not provide an enabling disclosure on how the component of his device alone or in combination could be effectively split. This is quoting from Dr. Gang's report. Where did you get that language? I don't know exactly. I did write it. At 3768. Question, and finally we get down to, as noted by Handel in quoting from his report, his 600 patent was never commercialized because of the absence of specific instructions on how to build a splittable sheath and valve assembly, as well as the fear that a poorly built mechanism might cause splattering of blood and valve components in the operating room environment. And again, is it correct that you took that language from the Handel declaration? Yeah, it's my words, but I took the gist of it from his declaration. Dr. Gang, even Dr. Gang on cross-examination, is not denying that there was a splittable valve. It just wasn't pretty. It didn't split in the way that some might consider it reliable or desirable. As this court has said, so we have Handel. We show, if you look at the figures, you see an introducer. Dr. Gang admits that there's a valve. You see in the diagrams it splits. How it splits precisely, whether it's safe, whether it might splatter or whatever is beside the point, as this court has said in the Sharing Corporation case, an anticipatory reference need only enable subject matter which falls within the scope of the claims it issued no more. So the great weight of the evidence showed that Handel anticipated the claims of the Lee patents. It had to work for its intended purpose. That's what enablement requires, right? Had to know how to make and use it. And what he's saying is, well, it disclosed something that could split, but it shattered and didn't work. So how is that an anticipatory reference? That's how I read the testimony that you just recited to us. Your Honor, I would disagree that anyone ever said it wouldn't work. It just, again. It shattered. It shattered. It splattered. Okay. Again, that question. For the jury, if I could read it that way, why don't we say they could have read it that way? And that's the end of your issue. Well, for one thing, the drawings from the Handel patent, the translation showed that this could be removed. Again, getting back to the function claimed of the claims of the Lee patent, this device, though it shattered, though it might not be optimally safe, could it be removed from a lead or catheter extending through it without taking it over the end of the lead or catheter? That's the function of the Lee invention. That's for the jury to decide, and they obviously construed this testimony against you. Well, and again, against the great weight of the evidence. Mr. Mock also testified at 3799, an engineer in the medical device area, that he could make this with no more than typical effort for reducing a medical device to practice, and the valve and sheath was removable from the lead without taking it out over the end. So what did the jury hear? They heard from Dr. Podette, who went element by element showing what was there. They heard from Dr. Gang, Pressured Products' own expert, who could not refute that there was a valve there, did not refute that it was removable, though it might shatter. To say that it shatters or that it's not safe doesn't say it doesn't work. It just may not work as well as people would like. There's nowhere in the record, Your Honor. Even if it's confusing, though, I mean, isn't our burden such that we have to say the jury could construe it the way they did if that's a reasonable and plausible potential construction of his testimony? Isn't that our burden? I mean, we don't get to, I may agree with you if I got to review it de novo, but I don't get to. Well, but what you do, Your Honor, get to review is that upon which the jury based their core starting point, which was what was the corresponding structure, which is a question of law. And the corresponding structure started at such a breadth, an impermissible breadth, that the jury could not but find infringement. And if we look at what the jury saw, up to the point where the scope of the claim term was so broadened, all they saw were non-scored PTFE sheets, x-rays showing complete cuts and severs, and then all of a sudden the definition changes. So if you look at the court's new definition, which includes, as I said, partial cuts, complete cuts, and whatever, where does the jury have to go but that anything that would amount to an introducer would infringe, and then as to invalidity, again, the great weight of the evidence. There is no way a reasonable jury could have come to the conclusion that the claims were valid based on what was before them, not just from our side but the other side. All right, let's hear from the other side. We'll save you rebuttal time, Mr. Henry. Thank you, Your Honor. Mr. Zeigler. Good morning, Your Honor. We've got means for removal. What's the structure in the specification? Means for removal, Your Honor, the structure is disclosed. The preferred embodiment is score lines. Score lines? Score lines. Well, a line is something that extends linearly, isn't it? It certainly can extend partially linearly. Then it isn't just a cut on the surface that might split because it's PTFE. It could also be a cut. Where does it say that in effect? Can you show me that again? Because, of course, we're looking for structure in the specification. Yes, Your Honor. Can you show me where it says cut on the edge that can split because it happens to be PTFE? I'm looking. Yes. I'm at Column 3. I suppose you are, too. No, I'm actually looking in Column 1. All right. I'm looking in one of our lines, 50 to 55. There's an Osborne patent. That Osborne patent is a PTFE. Is this the structure identified as the corresponding to the claimed function? That's the way the statute tells us. We find the function, means for permitting removal. Where is the structure that corresponds with that? The structure is in two places. First of all, Your Honor, as you pointed, in Column 5, just to reference that first, along around line 59, again, the detailed nature by which such split-able structure is implemented or how peel-away feature is realized is not critical to the invention. Any method now known or later devised by which such sheets and valve assemblies may be split or separated. You've got to have structure in the specification. Where is it? You just said it's score line, and a line is not a cut on the surface, is it? Why isn't that right there enough to say that the magistrate judge had it right, the district judge didn't follow the statute? The statute required you to find the structure in the specification. I don't see any place here where it says a cut on the surface is a score line. As set forth in Column 1 in the references that are specifically delineated under the statement, where it begins on line 41, the sheath is scored so that it is withdrawn by splitting, peeling it off with a pacemaker, and it says C. Littleford. It identifies a particular patent number. This is a particular reference to a journal of cardiology. It identifies the Osborne patent. Counsel, to prevail and preserve the district court's construction, you then need us to be willing to read the content of every one of these articles and say you are entitled to the structure disclosed in every one of them for 112.6 purposes. Wouldn't that be indefinite by definition? And violate our Atmel decision on top of it, which I noticed for some strange reason nobody cited. I know why you didn't cite it. It didn't help you. Atmel is on Pointeron, and in Atmel, I think the only disclosure was a reference to a title. This is much more than a title. This is a specific patent, and this was presented. No, no, but you want us to reference each of these titles. Each of these titles and or patents that are referenced here, you want us to look beyond the title, which is the thing you gave us in the spec, and actually give you all of the structures that every one of these references might disclose as though you had yourself disclosed them in this spec. Your Honor, the answer to that question is yes. But then the specification says score lines are shown as diametrically opposed from each other across the cross section of the introducer. So the structure is pretty clear here. It's a line across the entire cross section, and I never find the word a cut on the PTFE surface. I don't think you'll find the word a cut. I don't think I will either, but that's what the district court says. It says a slit, slot, tab. That's right. It says linear perforation, slit, slot, tab, line, severing, weakening, or tear that can be partial or complete, not cut. And those words do appear in those patents, and the point is, Your Honor, the point of ordinary skill in the art looks at this patent and reads it reasonably and says, what is this invention all about? They look at Figure 3 and they see a slit line running from the valve down the sheet. That is correct, Your Honor. Certainly they see that in the drawing. Is there any place that it shows a slit, just a mere little slit, and then a little asterisk that says, oh, by the way, this is PTFE, so it will split all the way down a linear… It says that in the references that I mentioned earlier in Column 1. And it mentions this further and it describes the heart of the invention and what this invention is all about, which is not how the sheet peels or how the valve peels. It's the fact that you have a splitable hemostatic valve attached to a splitable introducer sheet. Those two things in combination is what made this invention such a wow, such an advance in the art. That's what it is, this combination. And a fair reading of this patent isn't that it was the score line that distinguished this and made this something special. It was any way that it could be. The specification talks about peeling. It talks about slitting. It talks about just pulling these two elements, a valve and a sheet, apart. What about the point discussed earlier, that all the prior art discussed was really a reference to the sheet alone, not a valve and a sheet? That is correct, Your Honor. The district judge is kind of construing this thing on the fly. Did he consider that? The district court judge during the trial did not, and I do not believe that argument was made to the district court judge at that time. I believe what the district court judge did was... Of course, I wouldn't really need to, because all I'd have to say is, Your Honor, stick with the structure and the specification, right? And there's nothing about slits in the specification. There is something... Slits, tears, partial or complete, which is ambiguous itself. There is a description, certainly under the Clearwater and Altmel case, that is more than sufficient to point one aboard near Skilney Art to understand that the gist of the invention is not just a score line. It can be done so long as you can peel it apart in an appropriate definition for score line. Do you get any obvious structure, or do you have to actually list a structure in the specification corresponding to the claimed function? It can't just be any other structure. No, this court has said that that's not enough. It's got to be something more than just an other embodiment within the scope of the invention. That's not enough. But the court has said that what is enough, I think in the Altmel case, was that there was just a title to a very hard-to-find document as mentioned by the court. Here there is a specific reference to specific paths. It's set forth right there in black and white. And if anything, there is a discussion in the specification that says part of the invention isn't the fact of how you split it, it's the fact that you can split it. That's what this invention is all about. Both elements need to be split, not one, not the other. And that's what the district court judge did. After a specific request from the defendants, don't you think that this court needs to construe these claims, construe this term at this time? And the answer was yes. I understand that they may have made an opening statement, but after the trial started, they were admonished two or three times that they're arguing claim construction in front of the jury, which prompted the judge to do what he needed to do at the time that he did it, as certainly permitted under the O2 case. Well, they're claiming the timing is improper. It was too far along. They're claiming that the time was improper for the judge to do that, and they were essentially not in a position to rebut it. The timing was not improper at all. It came up at the appropriate time because they had been admonished two or three times about raising these issues, and they kept raising the issues, and there's a reason why they raised that issue. There is a reason why they raised that issue of this claim construction. They weren't surprised at all, because during the hearing the district court did the record, they had a proposed claim construction, another proposed claim construction, which is even narrower than the one they argued at the markment. And the question you might say is, why would they want an even narrower claim construction? And the answer to that question is that they had submitted a document to the Food and Drug Administration, a 510K, which they now say was preliminary, but there's nothing on the report from the federal government. The Food and Drug Administration says it's preliminary. And how do they describe this product to the Food and Drug Administration? They called it scored, a scored introducer. So of course they didn't want that definition. They wanted an even narrower definition. This was a calculated attempt by them to get an even narrower definition because they were concerned that under the original definition that they brought it upon themselves after they were admonished to bring it up again. And then when the judge asked them, is it appropriate, should I go forward with the claim construction, the answer was unequivocally, yes, you should. They needed that. And they got what they asked for, another claim construction. They had a proposal for that claim construction. They just didn't get the proposal they wanted. They got the judge who went back and looked at what these other references mentioned and used those words as the words that he was going to construe, both terms, both the splittable valve and splittable sheet to me. The other issue that came up was the validity, the fully anticipated anticipatory, supposed fully anticipated references, Hengel 600. In this case, Dr. Hengel submitted a declaration during the reexamination process. And his declaration makes it absolutely clear in paragraph four. It states under the penalty of perjury that while splittable sheets or capillaries were known prior to 1991, that's what we were talking about earlier and also mentioned in the patent in column one, there was no known prior design for splitting all the elements of a combined hemostatic valve and introducer sheet. No known design. His, he goes on to say, there is no tearaway or controllably splittable hard plastic valve body in my patent Hengel 600. Dr. Gang testified that the valve shown in the Hengel reference was not splittable in the sense that the patent is talking about. And yes, yes, he does, Dr. Hengel does say that you could shatter. In a medical device, it's not that shattering is less preferred. No one is going to equip a medical device in someone's chest to introduce introducers and then shatter it. Under that standard, I guess you could reconfigure a seatbelt to make it into an orange juice squeezer. But that's not the teaching that's provided. That's not even the disclosure that's set forth in the Hengel reference. That's what Dr. Hengel said. That's what the patent office looked at. And they reissued, reexamined, and then ultimately issued the 904 patent. And let's talk about Dr. Kote and his credentials and why the jury was free, maybe not to give him all the believability that they think he's entitled to. Was he familiar with these kind of devices? No. Had he ever observed a procedure using these kind of devices? No. Did he ever talk to someone who used these devices? No. Did he consider the rulings of the court in the market? No. Compare that with Dr. Gane, who is referred to as an electrophysiologist who practiced for many years. He looked at this reference, and what did this reference teach him? It taught him basically what Dr. Hengel had said. There's no splittable valve shown in this reference. It doesn't fully anticipate the 904 patent, which is exactly the conclusion the patent office came to because they had Hengel right in front of them. They had the declaration right in front of them,  Any other questions on these? I just have one question regarding the exclusive license. Is it in the record, your exclusive license? I believe the answer to that is yes, Your Honor. It is in the record? Yes, Your Honor. We couldn't find it as part of the appendix. Has your standing ever been challenged under that? Pardon? Has your standing to bring the action been challenged under the exclusive license? It was not challenged. There was a motion filed to amend the pleadings to join Dr. Lee, who is the inventor. That was filed late in the case, and that motion was denied. I do not believe as part of that challenge there was some issue raised as part of that motion that there wasn't standing to sue. Any more questions? Okay. Thank you, Mr. Zeitlin.  Thank you, Your Honor. Dr. Lee basically took the deal in terms, as I mentioned earlier, in terms of using the convenience of 112.6. If pressure products had wanted, or I'm sorry, if Dr. Lee had wanted to include things like PTFE, which were known, if they wanted to say that the cut at the top and somehow molecular splitting straight thereafter is an acceptable alternative, they could have done so, but they didn't. The law is very clear under Shumanada, among others, that if you invoke 112.6, part of the deal is the corresponding structure includes and excludes all but that shown in the specification. What is shown in the specification? Score lines, partial thinnings, furrowing down links, and it is the score lines themselves which permit or facilitate the splitting, and again, both of the valve and the sheath. That's part of the claim. That's what's shown in the specification. Had they wanted to go to this, anything that splits whatsoever, they readily could have. We patent practitioners are used to giving alternatives so that if we do invoke 112.6, we have that luxury. They gave that up. We and the rest of the public relied on that. Dr. Handel, declaration under penalty of perjury, a German citizen whom we tried to depose but were not able to. I think the weight of that should be considered when looking at that overall equation. Briefly, Dr. Podette, no Daubert motion was ever filed, and yet it seems to be impromptu urged here. He was, by order of the district court, a person of ordinary skill in the art. He testified at great length as compared to Dr. Gang who testified that he spent approximately 10 hours preparing for his disclosure, did not read all of the documents provided, and did not write most of his report. And you've heard what Dr. Gang said, even if you do want to accept him as the better authority. There was a valve. It was removable. It just wasn't pretty. And while pressure products argues that any way to split or separate this thing is acceptable, well, except that if it's not pretty and therefore that doesn't count. You can't have it both ways. We believe that the construction of first of the corresponding structure and then of that term scoreline was fundamentally flawed and should be reversed at this level and either per this court's authority of judgment or matter of law granted or at least a new trial. We do believe that the timing of the reconstruction was unfairly prejudicial to the point where a fair trial was impossible for my client. Had we gone all the way, had we not had a prior construction before trial, none at all, everybody would have had the opportunity to prepare for trial equally, preparing for all reasonable possibilities. We didn't have that chance. Don't bring up the points you lost on before. Thank you, Your Honor. Well, we will return to our plain construction issue then. Thank you very much, Your Honor. Okay. Thank you. Thank you both. The case is taken into submission. That concludes the arguments for this morning. All rise.